IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

MELANIE NICHOL,

        Plaintiff,

vs.

CITY OF SPRINGFIELD; GINO GRIMALDI,
in his individual and official capacities, and
RICHARD L. LEWIS, in his individual and
official capacities,

        Defendants.

Case No. 6:14-cv-01983-AA
**OPINION AND ORDER**

AIKEN, Judge:

    In this employment action, plaintiff Melanie Nichol, a former communications officer

employed by defendant City of Springfield ("the City"), alleges she was terminated in violation

of her rights under federal and state law. Plaintiff alleges the City, along with individual

defendants Gino Grimaldi (the City Manager) and Richard Lewis (the former Acting Chief of the

Springfield Police Department), fired her in retaliation for reporting misconduct in the

Springfield Police Department. Plaintiff asserts that defendants' actions violated her rights to

free speech, due process, and equal protection under the United States Constitution; her right not

to be retaliated against for reporting sexual misconduct in the workplace under Title VII of the Civil Rights Act and Oregon's employment discrimination and whistleblower statutes; and her rights as a union member.

Defendants now move for summary judgment on all claims. Defendants filed their motion more than a year and a half ago, but I stayed consideration of the motion pending resolution of state court proceedings related to the revocation of plaintiff's telecommunications license, pursuant to the principles articulated in *Younger v. Harris*, 401 U.S. 37 (1971) and *Gilbertson v. Albright*, 381 F.3d 965 (9th Cir. 2004) (en banc). *See Nichol v. City of Springfield*, 2016 WL 3512071, *5 (D. Or. June 27, 2016). In July 2017, the Oregon Court of Appeals affirmed the revocation of plaintiff's license, and plaintiff elected not to petition the Oregon Supreme Court for review. Accordingly, I lifted the stay and resumed consideration of defendants' motion. I heard oral argument on the motion on November 16, 2017.

For the reasons set forth below, defendants' motion for summary judgment is granted in part and denied in part. Specifically, I hold that Grimaldi is entitled to summary judgment on all claims against him and that all defendants are entitled to summary judgment on plaintiff's due process claim. The motion is otherwise denied.

## BACKGROUND

Because the motion before the court is defendants' motion for summary judgment, the following factual summary construes the evidence in the light most favorable to plaintiff. *JL Beverage Co., LLC v. Jim Bean Brands Co.*, 828 F.3d 1098, 1105 (9th Cir. 2016).

Beginning in 2004, plaintiff worked as a communications officer (sometimes referred to as a dispatcher) for the Springfield Police Department. For seven years, she did her job without disciplinary incident. Her 2011 to 2012 performance review rated her as meeting or exceeding

expectations in all areas, and noted that she was "helpful and courteous to her co-workers." Owens Decl. Ex. 8 at 37–38.

In December 2011, plaintiff contacted the City's Human Resources Director, Greta Utecht, to complain about the conduct of some Springfield Police Department officers. Utecht, who was out of town, directed plaintiff to meet with HR employees Tom Mugleston and Peter Fehrs. According to a memo Fehrs drafted about the meeting, plaintiff appeared nervous and told HR staff she was anxious because police department employees were discouraged from reporting problems. Fehrs wrote that plaintiff's statements focused on "a history of the detective unit coming into dispatch, using foul language and anger at dispatchers in the dispatch area, or 'blowing up' at dispatchers while on the job." Lewis Decl. Ex. 1 at 1.

Plaintiff supported her complaint with descriptions of three specific instances of purported misconduct. The first incident involved a SWAT team call that had taken place about a year before plaintiff approached HR. Plaintiff was in the dispatch office and the SWAT team was out on a call dealing with a barricaded suspect who claimed he had murdered a sex worker. It was the dispatchers' practice to individually inform SWAT team members when a SWAT call went out. One member of the SWAT team, Officer George Crolly, was not notified about this particular call. Plaintiff reported to Fehrs and Mugleston that Crolly, who was furious about the oversight, came into the dispatch office and yelled at a dispatcher, using an expletive. According to Fehrs's notes, Crolly's outburst happened while dispatchers were still on the phone, including with the barricaded suspect. Plaintiff expressed concern that Crolly had exacerbated an already stressful situation.

The second incident arose when a different officer was ordering pizzas for those in the office to share. After dispatchers asked the officer when the pizzas would arrive, the officer

entered the dispatch office while calls were in progress and yelled at the dispatchers about pestering her. Plaintiff went to a sergeants' meeting the next day to address the issue, telling the officers that they could not yell in the dispatch office and needed to pull communications officers outside to address any issues. Plaintiff reported that the next day, Sergeant Dave Lewis called her into his office. He rudely told plaintiff she could not come into sergeant's meetings to address issues, treated her like he was interrogating a suspect, and was so aggressive he scared plaintiff. He ended the meeting by telling plaintiff, "Don't think you're not welcome back here. You're welcome back if you bake us some cookies." Lewis Decl. Ex. 1 at 2. Dave Lewis is the brother of defendant Richard Lewis, and the two are very close.[1]

Finally, plaintiff described a confrontation with Officer Jeff Martin. Plaintiff and Martin had supported different candidates in the recent union elections; Martin's chosen candidate won, and he called plaintiff on the phone to gloat about the results. After the two traded sarcastic remarks, Martin barged into the dispatch office and called plaintiff a "little bitch, a little shit, and a little snot." Lewis Decl. Ex. 1 at 3. It was this incident that convinced plaintiff it was time to come to HR with her concerns about officers yelling in the dispatch office; she believed detectives had come to think they would face no consequences for such behavior. HR understood the Martin incident to be the focus of plaintiff's complaint and investigated plaintiff's allegations related to that incident. They did not investigate plaintiff's complaints about Crolly or Dave Lewis.

On January 10, 2012, plaintiff met privately with Utecht. There is conflicting evidence about why this meeting took place. Plaintiff testified that her meeting with Mugleston and Fehrs proceeded normally until she moved from describing the dispatch office incidents she had

---

[1] To avoid confusion, throughout this opinion, I refer to defendant Lewis as "Acting Chief Lewis" and to his brother as "Dave Lewis."

personally witnessed to describing serious misconduct among police department senior staff, including allegations involving then-Chief of Police Jerry Smith. Plaintiff stated that once she "started down the road" of reporting serious misconduct, Mugleston and Fehrs shut her down and told her she would need to meet with Utecht directly. By contrast, Utecht testified that Fehrs and Mugleston referred plaintiff to her because they were concerned about how upset she was regarding the dispatch office issues and "weren't sure exactly what was going on." Utecht Dep. 36:16–17.

Utecht and plaintiff agree that they met for a long time, between two and three hours. Plaintiff testified that during her meeting with Utecht, she reported widespread misconduct in the police department, including captains having inappropriate relationships with subordinates, officers having sex in the workplace, and a longstanding affair between Chief Smith and another departmental employee. Plaintiff stated that she linked Chief Smith's affair to favoritism and staffing decisions that posed safety and fairness issues. Utecht denied that plaintiff reported any sexual misconduct or favoritism to female employees, but acknowledged that plaintiff complained about Chief Smith showing favoritism generally. Utecht testified that plaintiff's fairness concerns centered on the union, which plaintiff considered to be corrupt.

After an investigation, HR concluded that both plaintiff and Martin had behaved unprofessionally. Martin disputed using the precise language plaintiff reported to HR, but admitted he had called plaintiff a "goofy bitch." Schmidt Decl. Ex. 4 at 31.

Believing she had exhausted her available avenues to relief within the workplace, plaintiff wrote an anonymous letter regarding misconduct in the department. The letter alleged that Chief Smith had been involved in several affairs with subordinates and had attempted to engage several other women in sexual relationships; had falsified data and forged documents to

justify pay and benefits for his paramour; had used ostensible business trips, funded by the City, for his own personal enjoyment; and had protected officers from discipline and granted them promotions in exchange for their silence about the affairs. The letter also accused Dave Lewis of misconduct, asserting he had carried on inappropriate sexual relationships with HR employees and female informants, violated criminal suspects' constitutional rights including the right to speak to an attorney, and used his inside access to keep a witness in one of his ongoing cases out of legal trouble so her credibility would not be impeached at trial. Finally, the letter asserted that Captain Richard Harrison had carried on a workplace affair for several years and had engaged in sexual activity in the department's gym, offering incentives to officers willing to keep his activity a secret. Plaintiff sent copies of the letter to the Department of Public Safety Standards and Training ("DPSST"), the state agency charged with licensing public safety officers; the Oregon State Police; and the local newspaper, *The Register-Guard*.

The City received a copy of the letter, at the latest, on January 18, 2012. Grimaldi, Utecht, and Chief Smith discussed the letter shortly thereafter. Although Grimaldi spoke to Smith and Utecht spoke to Smith's alleged paramour about the letter, the City did not formally investigate the allegations against Chief Smith. Chief Smith had previously investigated Captain Harrison for misconduct and concluded that the allegations were baseless. Grimaldi did not otherwise investigate the allegations against Harrison. Grimaldi testified that the City investigated the allegations against Dave Lewis, but did not report the results of that investigation.

Shortly after the City received the anonymous letter, plaintiff had a follow-up meeting with Utecht. The record is unclear on the timing of the meeting, but it likely happened after Utecht sent a February 10, 2012, memo to Chief Smith summarizing the investigation of

plaintiff's complaint about Martin. Chief Smith attended the meeting with plaintiff and Utecht. During the meeting, Utecht told plaintiff it had found her allegations about Martin unsubstantiated, but did not address any allegations of wider misconduct. Plaintiff expressed her concern to Utecht and Chief Smith that she would be targeted by police department employees because others would know she had gone to HR due to the investigation, but Utecht and Chief Smith assured her she had nothing to worry about.

Spurred by plaintiff's complaints, Utecht conducted a department-wide employee survey and met one-on-one with employees. After completing the survey, Utecht attended a sergeant's meeting during which she addressed documentation related to workplace misconduct. Utetcht testified that she used plaintiff as an example during this meeting but that the briefing did not focus on plaintiff. Sergeant John Umenhofer, who attended the meeting, remembered it differently; he stated that Utecht told the sergeants that "every department has an employee" like plaintiff and that they needed to "document, document, document everything [plaintiff] does." Umenhofer Dep. 55:6–10.

It was well-known that plaintiff had complained to HR. Utecht believed that the entire police department knew about the complaints. Umenhofer relayed a conversation with Dave Lewis during which Lewis complained about plaintiff. Using foul language, Dave Lewis told Umenhofer, "I shouldn't say this, but some people need to be shot." Umenhofer Dep. 39:2–16. According to Umenhofer, Dave Lewis was "livid" plaintiff had complained to HR.

About a year passed. In March 2013, Chief Smith abruptly announced his retirement. It later came to light that Grimaldi had asked him to resign after a video of Chief Smith and his paramour surfaced, substantiating some of the allegations in the anonymous letter and in the

complaint plaintiff made to Utecht. Defendant Richard Lewis assumed the role of Acting Chief of Police.

Also in March 2013, plaintiff lodged a complaint with Sergeant Richard Charboneau about another Springfield Police Department officer.[2] Umenhofer and Charboneau both testified that the officer was dangerous and should not have been hired, stated that he was kept on the police force despite numerous serious misconduct issues, and reported other officers' reluctance to work with him due to safety concerns. Umenhofer believed the officer was able to maintain his position, in part, because he was close friends with Dave Lewis, and Acting Chief Lewis used his rank to protect his brother's friends.

Plaintiff told Charboneau that she had learned about a message the officer had sent using the department's computer-based "MDC" system. In the message, the officer had gossiped to another department employee that the vehicle of a former Springfield police officer had been parked in plaintiff's driveway overnight. Plaintiff believed the officer had violated departmental policy by using his access to state databases to run the vehicle's license number and by sending a message about non-work matters over the MDC system. She told Charboneau she was concerned that the officer was watching her, noting that he had also reported her for alleged misuse of sick leave in the past. There is conflicting evidence in the record regarding what plaintiff told Charboneau about how she learned about the MDC message. Charboneau's notes indicate plaintiff told him she was informed by another dispatcher, but plaintiff maintains she never said that. Plaintiff in fact learned about the message by looking it up herself on a work computer.

---

[2] Because this opinion discusses information from the officer's confidential personnel file, the officer's identity is not disclosed.

Acting Chief Lewis assigned Sergeant Anthony Rappé to investigate plaintiff's complaint. Rappé concluded that although the officer had not used database access to run the license plate number, he had violated departmental policy by sending a personal message using the MDC system. As discipline, Rappé counseled the officer on appropriate use of the MDC system and the dangers of workplace gossip.

During the course of the investigation, however, Rappé began to suspect that plaintiff had not been entirely truthful to Charboneau. On April 19, 2013, Rappé met with plaintiff and pressed her about how she had initially learned about the MDC message. Plaintiff did not want to answer, arguing it had nothing to do with whether the officer had violated departmental policy. Rappé ordered her to answer his question, and plaintiff asked him whether she could be disciplined for refusing an order. When Rappé answered yes, and told plaintiff that discipline up to termination was possible, plaintiff refused to answer any more questions without a union representative present. In his investigative memo, Rappé wrote that when plaintiff "walked out of [his] office," she "told [him] that she may not be a police officer and familiar with all of her rights but she was not a stupid person." Schmidt Decl. Ex. 3 at 26. At his deposition, Rappé testified that he didn't understand why plaintiff would refuse to answer the question if she had nothing to hide.

On April 23, 2013, Rappé met with plaintiff with a union representative present. At that meeting, plaintiff told Rappé she had looked up the MDC message on her own computer and denied ever telling Charboneau she had learned about the message from another dispatcher.

On April 25, 2013, Utecht and Acting Chief Lewis called Charboneau to ask him how certain he was that plaintiff had told him she learned about the MDC message from another dispatcher. When Charboneau responded that he was quite sure, Utecht and Acting Chief Lewis

directed him to write a memo on the subject because they would be taking disciplinary action against plaintiff for dishonesty. Acting Chief Lewis ordered Rappé to investigate further whether plaintiff had been dishonest when she made her report to Charboneau.

On May 1, 2013, Acting Chief Lewis notified plaintiff by memo that she was under investigation for misconduct. The memo alleged plaintiff had provided false or fictitious information to supervisors, specifically Charboneau and Rappé, during the investigation regarding the MDC message. Plaintiff was placed on paid leave pending the results of the investigation. On May 10, 2013, Rappé wrote a memo to Acting Chief Lewis regarding the dishonesty investigation. Rappé concluded that it was "apparent" plaintiff had been untruthful and was trying to blame Charboneau rather than own up to her dishonesty. Schmidt Decl. Ex. 3 at 30.

Acting Chief Lewis then reviewed the HR records regarding plaintiff's prior complaints. When he read the Martin complaint, he noted what he believed to be an inaccuracy in her report about the Crolly incident; Acting Chief Lewis, who at the time of that incident had been a member of the SWAT team, was certain the call with the barricaded suspect was over by the time Crolly entered the dispatch office to yell at the communications officer. His certainty rested on his own memory that he had a conversation with Crolly before Crolly entered the dispatch office, which meant that the incident had been resolved and the SWAT team had returned to the station.

Acting Chief Lewis ordered Rappé to investigate whether plaintiff had been dishonest in her report of the timing of the Crolly incident. In a memo dated May 16, 2013, Rappé reported that he had confirmed most of the details of plaintiff's report through an interview with Crolly. Crolly admitted he had barged into the dispatch office, yelled at a dispatcher, and used an

obscenity. However, Rappé concluded the incident with the barricaded suspect had been "long over" by the time Crolly entered the dispatch office. Schmidt Decl. Ex. 3 at 35. Rappé concluded that plaintiff had provided false and misleading information to HR when describing the Crolly incident.

On May 22, 2013, Acting Chief Lewis gave plaintiff written notice that she was being fired for dishonesty. On May 31, 2013, plaintiff responded in writing. She maintained that the alleged examples of dishonesty were mere misunderstandings and asserted she actually was being fired in retaliation for reporting workplace misconduct. Plaintiff's termination was effective June 5, 2013.

Plaintiff promptly grieved her termination with Acting Chief Lewis. In a memo dated June 8, 2013, Acting Chief Lewis wrote back to say he had found no basis for altering his termination decision. Plaintiff, through the union, appealed to Grimaldi. In a July 24, 2013 memo from Grimaldi to the president of the Springfield Police Association, Grimaldi denied the grievance and upheld Acting Chief Lewis's termination decision. The union elected not to arbitrate the termination, rendering Grimaldi's decision final.

On February 17, 2014, plaintiff submitted a complaint to the Oregon Bureau of Labor and Industries ("BOLI"), alleging she had been fired in retaliation for reporting misconduct. On September 16, 2014, BOLI closed its investigation and issued plaintiff a right-to-sue letter. Plaintiff field this lawsuit on December 11, 2014.

After BOLI closed its investigation but before plaintiff filed this action, DPSST initiated licensure revocation proceedings against plaintiff. Pursuant to state law, DPSST is required to revoke the certification of any dispatcher who is terminated for cause. Or. Rev. Stat. §

181.662(4). A termination for dishonesty is a termination for cause. Or. Admin. R. 259-008-0070.

On April 21, 2015, the parties participated in a contested case hearing before an administrative law judge. DPSST was represented by an Assistant Attorney General from the state Department of Justice, and plaintiff was represented by counsel. The ALJ heard testimony and took other evidence. On June 19, 2015, the ALJ issued a proposed order. The ALJ recommended that DPSST find that plaintiff was *not* discharged for cause and that her telecommunicator license should *not* be revoked. Specifically, the ALJ found the weight of the evidence showed the purported instances of dishonesty likely stemmed from misunderstandings and that DPSST had conducted no independent fact-finding of its own, instead relying on the records of the police department's internal investigations.

On December 17, 2015, DPSST issued its Final Order. DPSST rejected the ALJ's recommendations and many of her findings of fact. Instead, DPSST found plaintiff engaged in dishonesty and had been discharged for cause. DPSST then revoked plaintiff's telecommunicator license. Plaintiff appealed to the Oregon Court of Appeals, which affirmed without opinion on July 6, 2017. Plaintiff decided not to seek review in the Oregon Supreme Court and the parties now ask me to rule on defendants' motion for summary judgment.

## STANDARDS

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine issue of material fact. *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts

which show a genuine issue for trial. *Celotex*, 477 U.S. at 324. "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008).

## DISCUSSION

I. *Preclusive Effect of the DPSST Revocation Proceeding*

Issue preclusion is at the heart of defendants' motion to dismiss. Defendants argue that DPSST's revocation decision precludes plaintiff from litigating *why* she was fired, because DPSST already decided she was fired for dishonesty. I agree that defendants' motivation for terminating plaintiff is at issue in all plaintiff's claims except her due process claim. Accordingly, I begin by asking what preclusive effect, if any, attaches to the DPSST decision.[3]

DPSST's decision to revoke plaintiff's telecommunications licensed was affirmed without opinion by the Oregon Court of Appeals. That affirmance, even though it included no reasoning, transforms the revocation into a "state court reviewed administrative determination" entitled to preclusive effect under 28 U.S.C. § 1738. *Eilrich v. Remas*, 839 F.2d 630, 632 (9th Cir. 1988). That statute gives both claim and issue preclusive effect to judgments of state courts. *Kremer v. Chem. Const. Corp.*, 456 U.S. 461, 478 (1982).

---

[3] In their reply brief, defendants take issue with the way plaintiff made her arguments regarding preclusion. Rather than including a section on preclusion on her response to the motion for summary judgment, plaintiff incorporated by reference the arguments she made in her brief opposing defendants' motion to file an amended answer. Defendants contend this argument-by-incorporation violates the Local Rules, which impose a thirty-five page limit on briefs unless the Court grants leave to file excess pages. I agree that plaintiff's counsel violated the spirit, if not the letter, of Local Rule 7-2(b) when he imported an additional seventeen pages into their already full-length response brief. Although I have discretion to sanction that behavior by declining to consider the arguments in the incorporated brief, I decline to do so here. *See Deverell v. Rex*, 2017 WL 3319382, *15 n.5 (D. Or. July 12, 2017). Instead, I remind plaintiff's counsel of the importance of complying with local rules, including page limits, in the future.

Plaintiff first argues that administrative agency decisions have no preclusive effect on Title VII claims. That is a correct statement of the law for *unreviewed* agency decisions. *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 796 (1986). But, as explained above, the DPSST decision is now a *reviewed* agency decision subject to the preclusion rules of § 1738. In *Kremer*, the Supreme Court expressly held that § 1738 applies to Title VII claims. 456 U.S. at 469.

Plaintiff also asserts that preclusion is inappropriate because the Oregon Court of Appeals employs an extremely deferential standard of review in agency appeals. Specifically, when reviewing agency action such as licensure revocation, the court decides only (1) whether the agency committed any legal errors and (2) whether the decision is supported by substantial evidence. *See Heller v. Ebb Auto Co.*, 774 P.2d 1089, 1092 (Or. 1989) (citing Or. Rev. Stat. § 183.482). Accordingly, the Oregon Court of Appeals did not actually decide whether plaintiff was dishonest or whether she was fired for cause; it merely decided that the record contained substantial evidence to support a finding of dishonesty. Plaintiff contends that § 1738's preclusion principles apply only to factual findings essential to the holding of the decision of the Court of Appeals.

In *Kremer*, Justice Blackmun contended that no preclusive effect should attach to the state agency decision because the reviewing state court, affirming the agency's decision pursuant to a standard of review quite similar to the one the Oregon court used here, "made no finding one way or another concerning the *merits*" of the petitioner's discrimination claim. 456 U.S. at 491 (Blackmun, J., dissenting) (emphasis in original). Justices Brennan and Marshall joined Justice Blackman's dissent. However, the *Kremer* majority squarely rejected Justice Blackmun's argument, holding that the scope of the state court's review doesn't matter for preclusion purposes because "[i]t is well established that judicial affirmance of an administrative

determination is entitled to preclusive effect" and "[t]here is no requirement that judicial review must proceed *de novo* if it is to be preclusive." *Id.* at 480 & n.21. In other words, the Supreme Court expressly rejected the argument plaintiff advances here. I am bound to follow the Supreme Court and therefore must reject plaintiff's argument. DPSST's revocation decision has issue preclusive effect in this action.

In evaluating the extent of that preclusive effect, federal courts look to state law preclusion principles. *Thornton v. City of St. Helens*, 425 F.3d 1158, 1165 (9th Cir. 2005). In Oregon, issue preclusion attaches when

> 1. The issue in the two proceedings is identical.
>
> 2. The issue was actually litigated and was essential to a final decision on the merits in the prior proceeding.
>
> 3. The party sought to be precluded has had a full and fair opportunity to be heard on the issue.
>
> 4. The party sought to be precluded was a party or was in privity with a party to the prior proceeding.
>
> 5. The prior proceeding was the type of proceeding to which this court will give preclusive effect.

*Id.* (citing *Nelson v. Emerald People's Util. Dist.*, 862 P.2d 1293, 1296–97 (Or. 1993)); *see also Eagle-Air Estates Homeowners Ass'n, Inc. ex rel. Harp v. Haphey*, 354 P.3d 766, 771–72 (Or. Ct. App. 2015). The party asserting issue preclusion bears the burden of proof on the first, second, and fourth elements; if that party carries its burden, then the burden shifts to the party against whom preclusion is asserted to show that the third and fifth elements are not met. *Eagle-Air Estates*, 354 P.3d at 772.

Here, the fourth factor is satisfied because plaintiff was a party to the DPSST proceeding and appeal. The fifth factor is also satisfied, because Oregon courts give preclusive effect to

agency decisions. *Wash. Cty. Police Officers Ass'n v. Wash. Cty.*, 900 P.2d 483, 487–88 (Or. 1995). That leaves the first, second, and third factors.

The first factor is satisfied because the issues DPSST decided are identical to some of the issues in this lawsuit. DPSST found that plaintiff was dishonest about the timing of the Crolly incident and the way she learned about the MDC message. Based on those findings of dishonesty, DPSST concluded plaintiff was fired for cause within the meaning of Or. Admin. R. 259-008-0070(3). In this lawsuit, defendants deny firing plaintiff for whistleblowing, for exercising her free speech rights, for being a woman, for reporting sexual harassment, or for invoking her right to have a union representative present when she answered questions; they assert they fired her for dishonesty. Accordingly, whether plaintiff was in fact dishonest is at issue in this case.

The second and third factors are satisfied as well. Regarding the second factor, plaintiff's dishonesty was the central question in the DPSST hearing. The findings of dishonesty were essential both to the DPSST's decision to revoke plaintiff's license and to the Court of Appeals' affirmance. As for the third factor, plaintiff participated in a contested case hearing at which a neutral administrative law judge heard evidence. Both parties were represented by attorneys. Witnesses were examined and cross-examined. Plaintiff availed herself of judicial review. It is easy to understand why plaintiff finds it unfair that DPSST rejected the recommendation of the administrative law judge and found against her. But DPSST's determination that the weight of the evidence was against plaintiff does not mean that plaintiff was deprived of a full and fair opportunity to be heard.

Issue preclusive effect attaches to DPSST's factual findings. Plaintiff is therefore barred from relitigating, in this proceeding, the factual questions whether she was dishonest when she

reported that Crolly entered the dispatch office while communications officers were still on the phone with the barricaded suspect and whether she told Charboneau that another dispatcher informed her about the MDC message.

But contrary to defendants' argument, issue preclusion does not require dismissal of plaintiff's claims.[4] It certainly would have helped plaintiff to be able to argue to the jury that she was not, in fact, dishonest; showing an employer's proffered legitimate reason for termination to be false is powerful evidence of pretext. But plaintiff has other ways to prevail. For example, she can succeed on her claims using a "mixed motives" theory, which applies when "both legitimate and illegitimate reasons motivated the [employer's] decision." *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 93 (2003) (Title VII); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977) (First Amendment retaliation); *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 270 & n.21 (1977) (equal protection); *Seitz v. State By and Through Albina Human Resources Ctr.*, 788 P.2d 1004, 1010 (Or. Ct. App. 1990) (state law claims). Alternatively, she can prevail on her claims by convincing the jury that the "legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *See Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1043 (9th Cir. 2005) (Title VII); *see also Anthoine v. N. Centr. Counties Consortium*, 605 F.3d 740, 750 (9th Cir. 2010) (First Amendment retaliation); *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 755 (9th Cir. 2001) (equal protection); *Kemp v. Masterbrand Cabinets, Inc.*, 307 P.3d 491, 494 (Or. Ct. App. 2013) (state law claims).

Here, plaintiff's theory is that after she brought her complaints to management, defendants aggressively searched for a reason to fire her. She contends that, even accepting

---

[4] The parties agree that neither the DPSST decision nor the Oregon Court of Appeals' affirmance has any effect on plaintiff's due process claims.

DPSST's factual findings, termination was a disproportionate punishment for minor incidents of dishonesty and that she was punished more severely than another employee accused of the same conduct would have been.

There is more than enough evidence in the summary judgment record to permit plaintiff to proceed on a mixed motives theory or a pretext theory. *See Mustafa v. Clark Cty. Sch. Dist.*, 157 F.3d 1169, 1180 (9th Cir. 1998) ("The crux of disparate treatment claims is the elusive factual question of intentional discrimination. Therefore, because of the inherently factual nature of the inquiry, the plaintiff need produce very little evidence of discriminatory motive to raise a genuine issue of fact." (citations and internal quotation marks omitted)). The record contains evidence from which a reasonable factfinder could conclude that some City employees were angry that plaintiff had made complaints to HR; that, after plaintiff reported misconduct to HR and sent the anonymous letter, she was labeled a problem employee and department staff were directed to "document, document, document" any problems with her; that this "problem employee" designation came after seven years of employment without disciplinary incident and at least one performance review stating that her ability to work with her coworkers met expectations; that other employees within the department were not terminated despite committing far more serious violations of departmental policy; that, having found one incident of dishonesty, Acting Chief Lewis combed her personnel file for another example to bolster his case for firing her; that the department engaged in no progressive discipline and moved straight to termination; and that plaintiff was fired for relatively minor dishonesty regarding collateral issues.

Defendants argue that DPSST's finding that plaintiff was terminated for cause precludes her from relitigating the question of employer motivation. But DPSST was not charged with

deciding employer motivation; indeed, it lacks jurisdiction to decide that question. In *Huesties v. Bd. of Police Standards & Training*, 767 P.2d 465, 466 (Or. Ct. App. 1989), a case involving the predecessor agency to DPSST, the petitioner sought review of an agency order revoking his basic and intermediate police certificates. *Id.* The agency had found that the petitioner committed two acts of dishonesty: misrepresenting his educational status on his employment applications and removing and copying a confidential tape from the police chief's desk. *Id.* The agency found those acts constituted "gross misconduct" and that the petitioner had been fired for cause within the meaning of the applicable regulation. *Id.* On appeal, the petitioner argued that the discharge was invalid because it was retaliatory; the agency responded that "it was not required to consider the validity of other aspects" of the employment decision and contended its review was confined to determining whether the factual record revealed "sufficient grounds" to terminate for cause. *Id.* The Court of Appeals agreed with the agency, holding that the agency lacked authority "to review the discharge to determine any question except the presence or absence of cause." *Id.* at 467.

The Court of Appeals has affirmed *Huesties'* application to decisions of the DPSST. *Lucke v. Dep't of Pub. Safety Standards and Training*, 270 P.3d 251, 254–55 (Or. Ct. App. 2012). In *Lucke*, the court expressly acknowledged that even when DPSST has determined an employee was terminated "for cause," there may still be a question of material fact regarding the basis for the termination. *See id.* at 255. Viewing the DPSST's final order in light of *Huesties* and *Lucke*, the statement that plaintiff was terminated "for cause" cannot be given preclusive effect as to defendants' actual or sole motivation.

None of this is to say that issue preclusion has no effect here. At trial, defendants will be entitled to an issue preclusion jury instruction regarding the dishonest statements. *See Nelson*,

862 P.2d at 1295 (approving use of a preclusion instruction when the elements of issue preclusion are met). Plaintiff therefore will have to convince the jury that even though she was dishonest, defendants decided to fire her—at least in part—for some other, impermissible reason. But although preclusion will make it more difficult for plaintiff to succeed at trial, it is not fatal to plaintiffs' claims; there is sufficient evidence of mixed motives and pretext to permit plaintiff to proceed to trial.

II.    *Claims Under § 1983*

Plaintiff asserts her constitutional claims against all defendants. Both municipal entities and their individual employees may qualify as "person[s]" acting "under color of" state law under 42 U.S.C. § 1983. Pursuant to that statute, however, a municipality is not vicariously liable for the acts of its employees. *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978). Rather, a plaintiff seeking to hold the municipal entity liable must show either (1) that the violation of constitutional rights was carried out pursuant to official policy or longstanding custom or (2) that the violation of constitutional rights was committed by someone with the authority to make final policy for the municipality. *Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir. 2004). Plaintiff's claims against the City fall under the second category and are predicated on the assertion that the decisions of Grimaldi, as City Manager, and Lewis, as Acting Chief of Police, "may fairly be said to represent official policy" of the City. *Monell*, 436 U.S. at 694. Defendants do not challenge that assertion in their motion for summary judgment. Accordingly, for the purposes of resolving this motion, I assume that both individual defendants had sufficient policymaking authority to subject the City to liability for their actions under § 1983.

A.    *Due Process Claim*

Defendants argue that they are entitled to summary judgment on plaintiff's due process claim because the termination process they provided her was constitutionally adequate.  To prevail on a procedural due process claim, a plaintiff must demonstrate "(1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002).  The parties agree that, as a public employee, plaintiff had a protected property interest in her job.  As such, she was entitled to "oral or written notice of the charges against h[er], an explanation of the employer's evidence, and opportunity to present h[er] side of the story." *Id.*  This opportunity to be heard must be "meaningful." *Washington v. Harper*, 494 U.S. 210, 235 (1990).  Even when an employee is given the chance to argue her case, due process is not satisfied if the hearing is infected by bias or if the "actual decision is made before the hearing[.]" *Id.*  To make out a claim of bias, a plaintiff must "overcome a presumption of honesty and integrity" on the part of the decision-makers. *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).  A plaintiff may show bias by demonstrating that the proceedings and surrounding circumstances demonstrate actual bias on the part of the decisionmaker. *Taylor v. Hayes*, 418 U.S. 488, 501–04 (1974).

Plaintiff contends that defendants' termination procedures violated her right to due process because both Acting Chief Lewis, who made the termination decision, and Grimaldi, who upheld that decision, were biased.  Acting Chief Lewis presents an easy case: Dave Lewis was the subject of some of plaintiff's complaints to HR; Umenhofer testified that Dave Lewis was "livid," said plaintiff "should be shot," and called plaintiff offensive names when he found out about the complaints; there is evidence Acting Chief Lewis's relationship with his brother was a problem in terms of his ability to discharge his responsibilities in an evenhanded manner;

there is evidence that Acting Chief Lewis and his brother were close, giving rise to the reasonable inference that Acting Chief Lewis knew how his brother felt about plaintiff; and there is evidence Acting Chief Lewis acted to protect the subject of one of plaintiff's complaints despite many officers' beliefs that the person was dangerous and posed a risk to the public and other officers. A jury could conclude from this evidence that Acting Chief Lewis was biased against plaintiff when he made the termination decision.

The harder case is Grimaldi, because "the failure to provide an impartial decisionmaker at the pretermination stage, of itself, does not create liability" so long as the final decisionmaker is impartial. *Walker v. City of Berkeley,* 951 F.2d 182, 184 (9th Cir. 1991). There is insufficient evidence in the record to support a conclusion that Grimaldi harbored any personal bias toward plaintiff; indeed, it is not clear from the record that he knew who she was before reviewing her file. But there is sufficient evidence to support a finding that Grimaldi did not make an independent decision and merely ratified Acting Chief Lewis's recommendation. *See id.* at 184 (approving a jury instruction asking whether the City Manager, though the nominal decisionmaker, had actually made an independent termination decision).

Grimaldi directed a member of the HR staff to draft his memo denying plaintiff's grievance. Because there is evidence from which a jury could conclude that Utecht was intentionally targeting plaintiff and helping to cover up departmental misconduct, the involvement of HR raises red flags regarding the independence of Grimaldi's decision. There is also evidence that Grimaldi did not always thoroughly investigate reports of misconduct. After the anonymous letter was delivered to the City, Grimaldi did not direct an investigation into the allegations against then-Chief Smith. That evidence could support an inference that Grimaldi was inclined to look the other way with respect to police misconduct, leading him to give short

shrift to plaintiff's allegation that she was being fired in retaliation for reporting such misconduct. In sum, there is a question of material fact as to whether bias infected plaintiff's entire termination process. *Cf. Stivers v. Pierce*, 71 F.3d 732, 746–48 (9th Cir. 1995) (denying summary judgment on a due process claim because the evidence arguably showed that the bias of one decisionmaker influenced the unbiased decisionmakers, rendering the entire process unfair).

Nonetheless, the evidence of bias here cannot save plaintiff's due process claim. As noted above, bias early in the decisionmaking process can be cured if the decision is reviewed by an impartial decisionmaker. The Collective Bargaining Agreement ("CBA") between plaintiff's union and the City sets out a four-step grievance process, with binding arbitration as the fourth and final step. Even assuming the evidence is strong enough to show that Acting Chief Lewis's bias infected the decisionmaking process through step three, Grimaldi's decision, there is no evidence in the summary judgment record suggesting that the arbitrator would have been influenced by Acting Chief Lewis's bias or would have simply "rubber stamped" the termination decision. Accordingly, plaintiff was afforded all the process due because she had access to another layer of review that could have cured any bias in the decisionmaking process. *See Armstrong v. Meyers*, 964 F.2d 948, 951 (9th Cir. 1992) (holding that grievance/arbitration procedures similar to those afforded by the CBA in this case satisfy the requirements of due process even when the grievance does not proceed to arbitration).

The union, not plaintiff, elected not to take the grievance to arbitration. But that does not change the analysis. The fundamental requirement of due process is the *opportunity* to be heard, not an actual hearing. *Mathews v. Eldridge*, 424 U.S. 319, 349 (1976). When a union decides not to pursue a grievance further, there is no due process violation because it is not the employer

who has cut off the opportunity for a hearing. An employee who disagrees with the union's decision to abandon her grievance may sue the union for breach of the duty of fair representation, but, because the union is not a state actor, its decision cannot render the process *constitutionally* inadequate. *See Armstrong*, 964 F.2d at 950. All defendants are entitled to summary judgment on plaintiff's due process claim.

B.    *First Amendment Claim*

To state a claim for First Amendment retaliation, a public employee must show that she spoke as a private citizen on a matter of public concern and that her speech was a substantial or motivating factor in the adverse employment action. *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009). If a plaintiff proves these elements, the burden shifts to the public employer to show that it had adequate justification for restricting speech and would have terminated the employee even in the absence of protected speech. *Id.* at 1071–72. Defendants argue that they are entitled to summary judgment on plaintiff's First Amendment claim because she did not speak on a matter of public concern, she did not speak as a private citizen, and there is insufficient evidence of causation and/or pretext.

The Ninth Circuit recently expounded on the meaning of matter of public concern:

Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record. If employee expression relates to an issue of political, social, or other concern to the community, it may fairly be said to be of public concern. However, an employee's motivation is relevant to the public-concern inquiry. We have framed that inquiry with two questions: Why did the employee speak (as best as we can tell)? Does the speech seek to bring to light actual or potential wrongdoing or breach of public trust, or is it animated instead by dissatisfaction with one's employment situation?

*Turner v. City & Cty. of San Francisco*, 788 F.3d 1206, 1210 (9th Cir. 2015). Whether an employee's speech was on a matter of public concern is a question of law. *Eng*, 552 F.3d at 1070.

In *Turner*, the court considered a temporary employee's complaints about the San Francisco Department of Public Works' purported use of temporary exempt employees in violation of civil service rules. 788 F.3d at 1209. The court acknowledged that the employee's complaints, which involved labor practices, were "potentially significant in their implications[.]" *Id.* at 1211. Nonetheless, the court held the speech was not a matter of public concern. The court found it significant that the employee had voiced his grievances only internally, rather than taking them to the press or the city's Board of Supervisors. *Id.* at 1210. In context, the court determined the speech arose "primarily out of concerns for [the plaintiff's] own professional advancement, and his dissatisfaction with his status as a temporary employee." *Id.* at 1211.

Having carefully reviewed the summary judgment record and drawing all reasonable inferences in plaintiff's favor, I find that plaintiff's speech was on a matter of public concern. To be sure, her complaints addressed, in part, her personal objection to the way she had been treated by Springfield Police Department employees. But she also raised systemic issues. Standing alone, her complaints about officers yelling at dispatchers in the dispatch office likely do not rise to the level of public concern because they deal primarily with interactions between departmental employees. But plaintiff asserts she also brought to light allegations of sexual misconduct and favoritism at the highest levels of the department. She also introduced evidence that she complained about officers violating suspects' constitutional rights. Those allegations unquestionably relate to matters of public concern; moreover, plaintiff expressly connected those problems to staffing, public safety, and misuse of funds.

Defendants deny that plaintiff ever raised the concerns about widespread misconduct to HR, but, on a motion for summary judgment, I am bound to construe the record in plaintiff's favor. Furthermore, there are undisputed facts in the record that tend to support plaintiff's story; for example, it is unclear why Utecht brought former Chief Smith to her second meeting with plaintiff, except as a way to send plaintiff a message that she should keep her mouth shut. The anonymous letter is further proof of plaintiff's motivation, assuming she can prove she wrote it. If plaintiff had been interested only in resolving personal disputes and protecting her own position, it is unlikely she would have sent the letter at all, much less anonymously.

Defendants next argue that plaintiff spoke in her capacity as a City employee, rather than as a private citizen. "Statements are in the speaker's capacity as a citizen if the speaker had no official duty to make the questioned statements, or of the speech was not the product of performing the tasks the employee was paid to perform." *Eng*, 552 F.3d at 1071 (citations and internal quotation marks omitted). Whether an employee spoke as a private citizen rather than as a public employee is a mixed question of law and fact. *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 967 (9th Cir. 2011). A court must first make a factual determination as to the "scope and content of a plaintiff's job responsibilities." *Id.* (citation and internal quotation marks omitted). Then, the court determines "the ultimate constitutional significance of those facts . . . as a matter of law." *Id.* (citation and internal quotation marks omitted). If plaintiff's speech "owes its existence" to her status as a public employee, then the inquiry is at an end. *Id.*

Defendants argue that plaintiff's speech was the product of performing the tasks she was hired to perform because she only witnessed and learned about the improper conduct because she was a public employee. That argument misstates the test; indeed, if courts applied the rule as stated by defendants, a public employee's report of official misconduct would *never* be protected

speech so long as she learned about the misconduct in the course of doing her job. Clearly, that is not the law. *See, e.g., Freitag v. Ayers*, 468 F.3d 528, 545 (9th Cir. 2006) (prison guard spoke as a private citizen when she reported sexual abuse she and other female corrections officers suffered at work). The question is not how the plaintiff learned about the subject of the speech, but whether the speech was a required part of plaintiff's job. Nothing in plaintiff's job description suggests that reporting sexual and financial misconduct of police officers, much less the Chief of Police, was a task she was paid to perform.

In *Hagen v. City of Eugene*, 736 F.3d 1251, 1260 (9th Cir. 2013), the Ninth Circuit vacated a jury verdict and directed judgment for the defendant employer on a First Amendment retaliation claim. The court found that the plaintiff police officer, who had expressed concerns about officers and training "within the chain of command" and pursuant to his duties under the police department's policy and procedures manual, spoke as a public employee and not as a private citizen. *Id.* at 1259. This case is distinguishable from *Hagen* in several important respects. First, in *Hagen*, the defendant introduced as evidence a city manual which required employees to report "unsafe practices of fellow employees[.]" *Id.* (emphasis omitted). Here, by contrast, defendants have not introduced any evidence that reporting safety issues fell under plaintiff's responsibilities as a dispatcher. Second, in *Hagen*, the court found it significant (though not dispositive) that the plaintiff had made all his complaints internally; the court expressly contrasted the facts in *Hagen* with a case in which the employee both raised concerns internally and leaked those concerns to the local newspaper. *See id.* (citing *Andrew v. Clark*, 561 F.3d 261, 266–67 (4th Cir. 2009)). Here, as explained, a jury could conclude that plaintiff made her concerns known to the press, the state agency that licenses peace officers, and the Oregon State Police. Based on the evidence in the summary judgment record, I am compelled to

conclude that, with respect to the allegations of sexual misconduct and financial mismanagement, plaintiff spoke as a private citizen and not as a public employee.

Because it is undisputed that dishonesty is a legitimate reason to terminate an employee, that leaves causation and pretext. As explained in the section of this opinion addressing preclusion, although there is ample evidence from which a jury could conclude plaintiff was fired because she was dishonest, there is also substantial evidence suggesting that plaintiff was also fired in retaliation for her complaints or that dishonesty was a pretext intended to cover a retaliatory termination. Of particular note is the fact that plaintiff was terminated for two relatively minor incidents of dishonesty without progressive discipline, despite having a spotless personnel record.

Regarding Acting Chief Lewis specifically, I divide the evidence into two categories: evidence that supports the inference that Acting Chief Lewis retaliated against plaintiff to protect his brother (which, by itself, is insufficient to support a First Amendment claim), and evidence that supports the inference that Acting Chief Lewis retaliated against plaintiff for exercising her protected constitutional rights (which could sustain a First Amendment claim). There is ample evidence in the first category. From the summary judgment record, a jury could find it was widely known within the police department that plaintiff had complained to HR; Acting Chief Lewis's brother, the subject of some of plaintiff's allegations, was angry with plaintiff and wanted her punished; Acting Chief Lewis knew from the records of plaintiff's complaints to HR that she had accused Dave Lewis of being rude, intimidating, and sexist; and Acting Chief Lewis combed through plaintiff's file to find a second instance of dishonesty to bolster the termination decision.

But proof of retaliatory motive alone is insufficient. In order to proceed on her First Amendment claim, there must be sufficient evidence of a causal link between plaintiff's *protected speech* (the complaints about sexual misconduct and financial mismanagement that plaintiff made to Utecht and documented in the anonymous letter) and her termination. Here, the evidence is weaker but nonetheless sufficient to withstand a motion for summary judgment. Plaintiff testified that she made the more serious allegations directly and privately to Utecht. A jury could conclude from the summary judgment record that Utecht, having heard plaintiff's complaints about serious misconduct in the department, took steps to sweep those complaints under the rug by making plaintiff a target for disciplinary action. The strongest evidence for that conclusion includes Umenhofer's testimony about Utecht's identification of plaintiff as a problem employee; Utecht's directive to "document, document, document" plaintiff's transgressions; and the fact that Utecht brought Former Chief Smith to the follow-up meeting with plaintiff, giving rise to the plausible inference that she was attempting to intimidate plaintiff into silence.[5] That evidence, combined with Acting Chief Lewis's arguably disproportionate response to plaintiff's dishonesty and the evidence that Acting Chief Lewis and Utecht worked together during the dishonesty investigation, is enough to support the inference that Utecht told Acting Chief Lewis about plaintiff's protected speech on a matter of public concern. In sum, a jury could conclude that Acting Chief Lewis knew about all of plaintiff's misconduct reports and retaliated by deliberately seeking out evidence that he could use as a pretext for firing her.

---

[5] It is not enough, standing along, for the evidence to support the inference that Utecht targeted plaintiff in an attempt to hush up complaints of sexual misconduct. Utecht is not named as a defendant and allegations regarding only her actions cannot support a claim against the City because there is no evidence she possesses final policymaking authority. *See Monell*, 436 U.S. at 690–95 (1978) (explaining when a municipality may be held liable for its employees' conduct under § 1983).

The evidence of causation is insufficient, however, as to Grimaldi. It is clear that Grimaldi knew about plaintiff's complaints regarding officers' treatment of dispatchers; as explained, however, those statements alone do not rise to the level of statements on matters of public concern, so they are unprotected. And there is insufficient evidence in the summary judgment record to support the inference that Grimaldi knew about plaintiff's statements on matters of public concern. The allegations of high-level misconduct do not appear in the records related to the investigation of plaintiff for dishonesty, and she does not refer with any specificity to the content of her misconduct complaints in her appeal letters. Grimaldi knew about the letter to the newspaper, of course, but there is no evidence that he connected that letter to plaintiff. Plaintiff argues that because of the timing of the anonymous letter, Grimaldi should have known or at least suspected that plaintiff was the author. But there is no evidence Grimaldi even knew who plaintiff was at the time the letter was received; Utecht and Acting Chief Lewis may have connected those dots, but there is insufficient evidence to support the conclusion that Grimaldi did. Because there is insufficient evidence that Grimaldi knew about plaintiff's statements on matters of public concern, her First Amendment claim against him fails for lack of causation.

Defendants argue that even if plaintiff's First Amendment claim survives summary judgment, Acting Chief Lewis is entitled to summary judgment on the grounds of qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). In deciding whether a defendant is protected by qualified immunity, courts ask two questions: "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right" and "whether the right at issue

was clearly established at the time of the defendant's alleged misconduct." *Id.* at 232 (citations and quotation marks omitted). As explained above, the summary judgment record here could support a finding that Acting Chief Lewis fired plaintiff in retaliation for speaking out on a matter of public concern in violation of her First Amendment rights. Therefore, the question is whether Acting Chief Lewis's conduct violated clearly established law.

At the time of plaintiff's termination, it was clearly established that reporting "high level corruption in a governmental agency" is speech on a matter of public concern. *Dahlia v. Rodriguez*, 735 F.3d 1060, 1067–68 (9th Cir. 2013) (citing *Marable v. Nitchman*, 511 F.3d 924, 932 (9th Cir. 2007)). Plaintiff reported classic examples of governmental corruption: sexual impropriety, favoritism, misuse of funds, and staffing decisions that endanger the public. Any reasonable officer would have known that the complaints plaintiff asserts she made to Utecht and in the anonymous letter qualified as statements on matters of public concern. Moreover, based on the evidence in the summary judgment record, no reasonable supervising officer could have believed plaintiff was required to report that sort of misconduct pursuant to her official job duties. Acting Chief Lewis is not entitled to qualified immunity.

Defendants' motion for summary judgment on plaintiff's First Amendment claim is granted as to Grimaldi but denied as to Acting Chief Lewis and the City.

C.    *Equal Protection Claim*

In support of her equal protection claim, plaintiff argues that defendants were predisposed to believe the men she accused rather than her because she is a woman. There is insufficient evidence to permit plaintiff proceed on this theory. It is true that, in two separate investigations regarding her dishonesty, defendants decided plaintiff had been untruthful and instead believed men who presented a different version of events. But that is insufficient to

show that she was not believed *on account of* her gender. She has introduced no direct or circumstantial evidence that defendants, as a matter of course, credit the statements of men and discredit the statements of women. There is evidence that Dave Lewis made a sexist remark to her about baking cookies, but "isolated incidents (unless extremely serious)" are insufficient to support a claim of gender discrimination. *Cf. Davis v. Team Elec. Co.*, 520 F.3d 1080, 1095 (9th Cir. 2008) (discussing proof of hostile work environment in the Title VII context).

Plaintiff also alleges that she was discriminated against on the basis of gender because her termination was in retaliation for reporting sexual harassment. The Ninth Circuit has recognized that retaliation for reporting sexual harassment may violate the Equal Protection Clause. *Alaska v. E.E.O.C.*, 564 F.3d 1062, 1069 (9th Cir. 2009). Specifically, when an employer responds to a sexual harassment complaint by punishing the person who made the report rather than by disciplining the harasser, the employer violates the Equal Protection Clause. *Id.*

As explained in detail in Section III of this opinion, *infra*, plaintiff has introduced sufficient evidence that she reported conduct that amounted to sexual harassment and that she was targeted for discipline as a result of making those reports. In addition, there is ample evidence that Acting Chief Lewis searched for a pretext to fire plaintiff in retaliation for complaining. For the same reasons set out in Section II.B, *supra*, the evidence that Acting Chief Lewis retaliated against plaintiff *for reporting sexual misconduct* is weaker than the evidence that he had a vendetta against her because she made his brother angry. But the evidence is still sufficient to survive summary judgment. At this stage, I conclude only that there is evidence in the summary judgment record that could support the inference that Acting Chief Lewis knew about the sexual misconduct complaints and made the decision to fire plaintiff at least partially

because of those complaints. It is for the jury to decide whether Acting Chief Lewis actually knew about the complaints and, if so, whether he was driven to retaliate against plaintiff in an attempt to punish her for bringing sexual misconduct to light.

With respect to Grimaldi, however, there is once again insufficient evidence to permit plaintiff's claim to proceed. As explained in Section II.B, *supra*, there is insufficient evidence to support the inference that Grimaldi knew plaintiff had complained about sexual misconduct when he upheld Lewis's termination decision. As a result, Grimaldi is entitled to summary judgment on plaintiff's equal protection claim.

Finally, defendants assert that qualified immunity shields Acting Chief Lewis from liability on plaintiff's equal protection claim. But at the time of plaintiff's termination, no reasonable supervisor could have believed that retaliation in response to an employee's report of widespread sexual misconduct is constitutional. *See Alaska*, 564 F.3d at 1069. Acting Chief Lewis is not entitled to qualified immunity. Defendants' motion for summary judgment on plaintiff's Equal Protection Claim is granted as to Grimaldi but denied as to Acting Chief Lewis and the City.

III.    *Title VII Claim*

Defendants next move for summary judgment on plaintiff's claim that the City violated her rights under Title VII of the Civil Rights Act.[6] Title VII makes it an unlawful employment practice for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a

---

[6] Plaintiff pleaded a Title VII claim against the individual defendants as well. I previously dismissed the claims against Grimaldi and Lewis because Title VII creates a cause of action against the entity only, not against individual supervisors. *See Nichol*, 2016 WL 3512071, *4 (D. Or. Jun. 27, 2016) (citing *Craig v. M & O Agencies, Inc.*, 496 F.3d 1047, 1058 (9th Cir. 2007)).

charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Title VII does not expressly make sexual harassment an unlawful employment practice. However, it does prohibit discrimination in employment "because of" a number of protected characteristics, including "sex." *Id.* § 2000e-2(a)(1). In the landmark case *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986), the Supreme Court held that sexual harassment in the form of a "hostile or abusive work environment" may support a Title VII claim. An employee asserting a retaliation claim under Title VII need not prove that the allegedly discriminatory practice actually violated Title VII; a report of discrimination constitutes protected activity so long as a reasonable person would think the behavior was prohibited by Title VII. *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 964 (9th Cir. 2009).

The Supreme Court recognizes two types of sexual harassment: *quid pro quo* harassment, in which an employee's willingness to participate in sexual activity "is directly linked to the grant or denial" of an economic benefit, *Vinson*, 477 U.S. at 65, and hostile work environment harassment, in which individuals of a certain gender are required to "run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living[,]" *id.* at 67. Plaintiff asserts that she was punished for reporting a hostile work environment. The Equal Employment Opportunity Commission has issued guidance regarding when sexual misconduct constitutes a hostile work environment. In the guidance, the EEOC explains that "Title VII does not prohibit isolated instances of preferential treatment based upon consensual romantic relationships." EEOC Policy Guidance on Employer Liability under Title VII for Sexual Favoritism, N-915.048 (Jan. 12, 1990) (internal quotation marks and punctuation omitted), *available at* http://www.eeoc.gov/policy/docs/sexualfavor.html. Such occurrences may be

"unfair," but they do not run afoul of the statute because the favoritism, though rooted in a sexual relationship, is not based on gender. *Id.* By contrast,

> [i]f favoritism based on the granting of sexual favors is widespread in the workplace, both male and female colleagues who do not welcome this conduct can establish a hostile work environment in violation of Title VII regardless of whether any objectionable conduct is directed at them and regardless of whether those who were granted favorable treatment willingly bestowed the sexual favors. In these circumstances, a message is implicitly conveyed that the managers view women as "sexual playthings," thereby creating an atmosphere that is demeaning to women. Both men and women who find this offensive can establish a violation if the conduct is sufficiently severe or pervasive to alter the conditions of their employment and create an abusive working environment.

*Id.*

Agency guidance, while perhaps not entitled to full *Chevron* deference, reflects "a body of experience and informed judgment to which courts and litigants may look for guidance." *Federal Exp. Corp. v. Holowecki*, 552 U.S. 389, 399 (2008) (internal quotation marks omitted). The EEOC guidance is inconsistent with Ninth Circuit precedent to the extent it suggests that a male employee may assert a hostile work environment claim due to discriminatory treatment of women. *See Patee v. Pac. Nw. Bell Tel.*, 803 F.2d 476, 478 (9th Cir. 1986). However, the guidance has otherwise been cited with approval by numerous federal courts. *See, e.g.*, *McGinnis v. Union Pac. R.R.*, 496 F.3d 868, 874 (8th Cir. 2007). I find its reasoning persuasive and adopt it here.

Plaintiff has introduced evidence that she reported three different individuals for sexually-based favoritism. Construing the facts in the light most favorable to plaintiff, she reported that former Chief Smith had engaged in a workplace affair, afforded favors to his paramour, given special treatment to other officers in order to keep the affair secret, and attempted to engage other women in sexual relationships; that Dave Lewis had inappropriate sexual relationships with both coworkers and police informants; and that Captain Harrison

engaged in workplace affairs including having sex in view of other employees in the workplace gym. Plaintiff also introduced evidence that Dave Lewis made a sexist comment to her about baking cookies and that a former employee was fired on trumped-up charges after reporting sexual harassment. Taken together, this evidence creates a question of material fact regarding whether plaintiff reported conduct that she reasonably believed amounted to a hostile work environment. That conclusion is further bolstered by plaintiff's testimony that the officer who sent the MDC message had asked her inappropriate questions about her dating life in the past. Although she never reported that conduct, it is "relevant to the inquiry concerning the reasonable belief that a violation [of Title VII] occurred." *Go Daddy Software*, 581 F.3d at 964.

For the reasons set forth in the section addressing plaintiff's equal protection claim, there is sufficient evidence of causation to put plaintiff's Title VII retaliation claim before a jury. Moreover, unlike plaintiff's equal protection claim, her Title VII claim may proceed on a theory of *respondeat superior* liability. *Miller v. Maxwell's Intern., Inc.*, 991 F.2d 583, 587 (9th Cir. 1993). This means that for Title VII, plaintiff is not required to prove that a final decisionmaker, such as Acting Chief Lewis, retaliated against her for reporting sexual harassment. Even if the jury were to find the evidence of causation insufficient as to Acting Chief Lewis, plaintiff could prevail on the merits of her Title VII claim based on evidence that Utecht (or other City employees) retaliated against her for reporting sexual misconduct. *See Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013) (holding that under Title VII, employers are generally liable for negligent failure to control working conditions and are strictly liable for harassment by anyone "empowered by the employer to take tangible employment actions against the victim"). Defendants' motion for summary judgment is denied with respect to plaintiff's claims under Title VII.

IV.    *State Law Claims*

Defendants also move for summary judgment on plaintiff's claims under state law. The state law claims are all asserted against the City only and not against the individual defendants.

A.    *Sexual Harassment Retaliation Claim*

Plaintiff asserts an employment discrimination claim under Or. Rev. Stat. § 659A.030(1)(f), which prohibits retaliating against an employee because that employee opposed an unlawful employment practice. Because Or. Rev. Stat. § 659A.030 "was modeled after Title VII, plaintiff's state and federal gender discrimination claims can be analyzed together." *Dawson v. Entek Int'l*, 630 F.3d 928, 935 (9th Cir. 2011) (quoting *Dawson v. Entek Int'l*, 662 F. Supp. 2d 1277, 1284 (D. Or. 2009)). For the same reasons outlined in the previous section addressing plaintiff's Title VII claims, the City is not entitled to summary judgment on plaintiff's state-law claim that the City retaliated against her for reporting sexual harassment.

B.    *Whistleblower Claim*

In addition to bringing a claim for First Amendment retaliation under § 1983, plaintiff asserts a whistleblower retaliation claim under Or. Rev. Stat. § 659A.203, Oregon's public employee whistleblower law.[7] The relevant statute makes it an unlawful employment practice for a public employer to

> Prohibit any employee from disclosing, or take or threaten to take disciplinary action against an employee for the disclosure of any information that the employee reasonably believes is evidence of:
>
> (A) A violation of any federal or state law, rule or regulation by the state, agency or political subdivision; [or]

---

[7] The complaint also included a whistleblower retaliation claim under Or. Rev. Stat. § 659A.199. I previously dismissed that claim, holding that the Oregon Legislature did not intend to make § 659A.199 claims available to public employees. *Nichol*, 2016 WL 3512071 at *4.

> (B) Mismanagement, gross waste of funds or abuse of authority or substantial and
> specific danger to public health and safety resulting from the action of the state,
> agency or political subdivision[.]

Or. Rev. Stat. § 659A.203(b). Where the employee's disclosure involves mismanagement, the

statute only applies when the claim "involve[s] more than mere routine complaints regarding a

public employer's policies" and instead "relate[s] to serious misconduct that is of public concern

and that does or could undermine the employer's ability to perform its mission." *Hall v. Douglas*

*Cty.*, 203 P.3d 360, 363 (Or. Ct. App. 2009). Reports of wrongdoing to supervisors or HR

qualify as protected "disclosures" under the statute. *Bjurstrom v. Or. Lottery*, 120 P.3d 1235,

1240 (Or. Ct. App. 2005). Plaintiff brings this claim against the City only, not against the

individual defendants.

Some of plaintiff's misconduct reports do not trigger the protections of the statute. For

example, plaintiff's complaint that an officer misused the MDC system is unprotected under state

law because the statute requires the complaint to relate to a legal violation or mismanagement

committed by "the state, agency or political subdivision[.]" Or. Rev. Stat. § 659A.203(b).

Defendants argue that the one-time use of the MDC system to send a personal message cannot be

attributed to the police department. Plaintiff cites *Hall v. Douglas County* and *Hall v. State*, 366

P.3d 345 (Or. Ct. App. 2015) for the proposition that individual employees' actions can trigger

whistleblower protections under state law, but neither case is on point. To begin, the Oregon

Court of Appeals did not consider in either case whether the disclosed activity qualified as action

by the governmental entity. Moreover, both cases are distinguishable. In *Hall v. Douglas*

*County*, the plaintiff had reported physical abuse by a coworker *and* alleged that his supervisor

and HR, though aware of the problem, took no action to correct it. 203 P.3d at 363. That is a far

cry from reporting a one-time violation of departmental policy. And in *Hall v. State*, the court

analyzed claims brought under three different state whistleblowing statutes, one which was § 659A.203(b). The other two statutes contain no requirement that the disclosure concern governmental action. *See* Or. Rev. Stat. § 659A.199; *id.* § 659A.230. The court analyzed the three claims together without noting the presence or absence of a governmental action requirement.

In the absence of case law addressing the issue, I must give effect to the "plain meaning of the statute's text." *State v. Gonzalez-Valenzuela*, 365 P.3d 116, 121 (Or. 2015). Extending § 659A.230's protection to public employees' disclosures of the legal violations of their coworkers would read the phrase "by the state, agency or political subdivision" out of the statute. Individual employee misconduct may trigger the statute's protection when combined with a supervisory failure to address the issue, but it falls outside the plain meaning of the statute when it stands alone.

By contrast, plaintiff's reports of sexual misconduct, favoritism, and activity that endangers public safety clearly qualify as "mismanagement" within the meaning of § 659A.203(b). *See Douglas Cty.*, 203 P.3d at 363. Defendants contend plaintiff is barred from supporting her § 659A.203(b) claim with facts related to those reports. Specifically, defendants argue that in the complaint, plaintiff unambiguously based her § 659A.203(b) claim *only* on her report that a single officer had violated departmental policy. *See* Compl. ¶¶ 52–57. I am not persuaded that I must hermetically seal each claim for relief in this way. At least two federal appellate courts have held that "the form of the complaint is not significant if it alleges facts upon which relief can be granted, even if it fails to categorize correctly the legal theory giving rise to the claim." *Gean v. Hattaway*, 330 F.3d 758, 765 (6th Cir. 2003) (citing *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 604 (5th Cir. 1981)). Of course, the complaint limits a plaintiff

in the sense that it must provide a defendant with fair notice of the claims against it and the factual basis for those claims. Here, the complaint alleges that plaintiff reported serious misconduct to HR. Defendants are plainly on notice of those allegations, as they address them in their briefing on plaintiffs' First Amendment claims. Plaintiff's failure to repeat those allegations in the section of her complaint addressing the § 659A.203(b) claim does not require me to enter summary judgment against her. Defendants' motion for summary judgment on the state law whistleblower claim is denied.

C.    *Wrongful Discharge*

The final claim at issue in the motion for summary judgment is plaintiff's claim for wrongful discharge. As explained in the prior opinion and order on the motion to dismiss, plaintiff's arguments on this claim are limited to her assertion that she was punished for asserting her right to a union representative present during questioning. *Nichol*, 2016 WL 3512071 at *5; *see also Archer v. Letica Corp.*, 868 P.2d 770, 771 (Or. Ct. App. 1994) (stating that to prevail on a claim for wrongful discharge, an employee must show she was "terminated for exercising an employment-related right, or for complying with or fulfilling a public duty"); *Rauda v. Or. Roses, Inc.*, 935 P.2d 469, 470 (Or. Ct. App. 1997) (explaining that an employer is liable for wrongful discharge if an employee is terminated "for pursuing a right related to his or her role as an employee," including a right related to union membership).

There is a question of material fact regarding whether Rappé drew an adverse inference regarding plaintiff's truthfulness from her insistence on having a union representative present. Rappé testified that plaintiff's decision to invoke her right to have a union representative present, rather than simply answer his question, suggested that she had something to hide and undermined her explanation that there had been a simple misunderstanding with Charboneau.

The initial determination that plaintiff had been dishonest originated with Rappé. To the extent plaintiff was terminated for dishonesty, her exercise of an employment-related right may have played a material role in the termination decision. Defendants' motion for summary judgment on the wrongful termination claim is denied.

## CONCLUSION

Defendants' motion for summary judgment (doc. 35) is GRANTED IN PART and DENIED IN PART as follows. All defendants are entitled to summary judgment on the § 1983 due process claim. Grimaldi is further entitled to summary judgment on the § 1983 equal protection and First Amendment claims. Defendants' motion is otherwise denied.

Because all claims against Grimaldi have been either dismissed or resolved in his favor, he is hereby dismissed from this action as a defendant.

IT IS SO ORDERED.

Dated this ___3rd___ day of December 2017.

_____
Ann Aiken
United States District Judge